**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:08cv246**

| | | |
|---|---|---|
| **US AIRLINE PILOTS ASSOCIATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| **AWAPPA, LLC, JOHN MCILVENNA, MITCH VASIN, PETER BLANDINO, ERIC FERGUSON, JEFF KOONTZ, RUSS PAYNE, KEITH KRUEGER, ERIC AUXIER, CHRISTOPHER CUNDARI, JACK TOOKE, DAVID BRAID, ROBERT J. NARLOCH, BRUCE A. HANNAH, RON GABALDON, SHAWN METZKER, JURIE MAREE, AL CASBY, JEFF ABBOTT, MARK DOYAL, LARRY DIEHL, STEVE TRIMMER, CJ SZMAL, JOE HEIL, KEVIN STEELE, and JOHN DOES 1-100,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

    **THIS MATTER** is before the Court on the Motion to Dismiss of

Defendants AWAPPA, McIlvenna, Vasin, Blandino, Ferguson, Koontz, and

Payne [Doc. 42], filed June 18, 2008, in which Defendants Eric Auxier,

David Braid, Al Casby, Christopher Cundari, Larry Diehl, Ron Gabaldon, Bruce A. Hannah, Keith Krueger, Robert J. Narloch, Shawn Metzker, CJ Szmal, Kevin Steele, and Jack Tooke joined; the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 63], filed June 19, 2008; the Motion to Dismiss by Individual Defendants Eric Auxier, David Braid, Al Casby, Christopher Cundari, Larry Diehl, Ron Gabaldon, Bruce A. Hannah, Keith Krueger, Robert J. Narloch, Shawn Metzker, CJ Szmal, Kevin Steele, and Jack Tooke, and Joinder in Motion to Dismiss Filed by AWAPPA Defendants [Doc. 77], filed June 24, 2008; and the Plaintiff's Motion for Leave to Amend First Amended Verified Complaint [Doc. 80], filed June 25, 2008.  The Court held a hearing on these motions on June 27, 2008.

## I.    PROCEDURAL POSTURE

The factual allegations concerning the parties before the Court, as set forth in the Plaintiff's First Amended Verified Complaint [Doc. 39], are as follows:

### A.    The Parties

The Plaintiff US Airline Pilots Association ("USAPA") is an unincorporated association with its principal place of business in Charlotte,

North Carolina.  [Id. at ¶2].  USAPA currently serves as the certified collective bargaining representative of all the pilots employed by US Airways, Inc. ("US Airways").  [Id.].  The Defendant AWAPPA LLC ("AWAPPA") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.  [Id. at ¶3].  It is alleged by the Plaintiff (and denied by the Defendants) that AWAPPA was created by several pilots formerly employed by America West Airlines ("America West") "for the purpose of destroying USAPA in order to obtain pecuniary benefits for former America West pilots that would otherwise be distributed to all US Airways pilots on a date of hire seniority basis."  [Id.].

The Defendants John McIlvenna, Mitch Vasin, Peter Blandino, Eric Ferguson, Jeff Koontz, and Russ Payne are all former America West pilots who are currently employed as pilots for US Airways and serve as directors of AWAPPA ("AWAPPA Defendants").  [Id. at ¶¶4-9].  Defendants McIlvenna, Vasin, Blandino, and Payne are residents of Arizona; Defendant Ferguson is a resident of Texas; and Defendant Koontz is a resident of California.  [Id.].  Defendants Keith Krueger, Eric Auxier, Christopher Cundari, Jack Tooke, David Braid, Robert J. Narloch, Bruce A. Hannah, Ron Gabaldon, Shawn Metzker, Al Casby, Larry Diehl, CJ Szmal,

3

and Kevin Steele ("Individual Defendants") are all former America West pilots who are currently employed as pilots for US Airways.  [Id. at ¶¶10-18, 20, 23, 25, 27].  Defendants Krueger, Auxier, Cundari, Tooke, Braid, Narloch, Hannah, Gabaldon, Casby, Diehl, Szmal, and Steele are residents of Arizona; Defendant Metzker is a resident of Oregon.  [Id.].

Defendants Jurie Maree, Jeff Abbott, Mark Doyal, Steve Trimmer, and Joe Heil are also former America West pilots who are currently employed as pilots for US Airways. [Id. at ¶¶19, 21, 22, 24, 26].  To date, Defendants Maree, Abbott, Trimmer, and Heil have not been served with process in this action.   Defendant Doyal has been served [Doc. 95], but he has not yet appeared nad his time for response has not yet expired.

Also named as Defendants in this action are John Does 1-100.  [Id. at ¶28].  None of these John Doe Defendants have yet been identified or served with process in this action.

## B.    Issues Before the Court

The Plaintiff seeks a preliminary injunction.  The Defendants, however, challenge whether this Court has subject matter jurisdiction over this matter, and some Defendants challenge whether this Court has *in personam* jurisdiction over them.  There is also a challenge to the propriety

4

of venue in this District.  The jurisdictional issues must be addressed

before the Court can entertain the issuance of injunctive or other

preliminary relief.

###    C.    Standard of Review

The burden is on the Plaintiff to demonstrate that subject matter

jurisdiction exists.  See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th

Cir. 1999).  The Court should grant a Rule 12(b)(1) motion to dismiss "only

if the material jurisdictional facts are not in dispute and the moving party is

entitled to prevail as a matter of law."  Richmond, Fredericksburg &

Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991), cert.

denied, 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992).

In the present case, the Defendants contend that the Amended

Complaint fails to allege facts upon which subject matter jurisdiction can be

based.  Accordingly, the Court must apply a standard similar to that applied

in reviewing a Rule 12(b)(6) motion.  Adams v. Bain, 697 F.2d 1213, 1219

(4th Cir. 1982).  "The purpose of a Rule 12(b)(6) motion is to test the

sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not

resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses."  Edwards v. City of Goldsboro, 178 F.3d 231,

243 (4th Cir. 1999) (internal quotation marks omitted). In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), cert. denied, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). While the Court must accept the plaintiff's factual allegations as true, the Court "need not accept the legal conclusions drawn from the facts." Eastern Shore Markets, Inc. v. J.D. Associates Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000). "Similarly, [the Court] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Id.

As the Supreme Court recently explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .... *Factual allegations must be enough to raise a right to relief above the speculative level....*

Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (emphasis added). Accordingly, a complaint will survive a Rule

12(b)(6) motion to dismiss only if it sets forth "enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

## II.    FACTUAL ALLEGATIONS

### A.    Events Leading to the Certification of USAPA as Collective Bargaining Representative for US Airways Pilots

In May 2005, US Airways merged with America West.  Following the merger, the process of integrating the workforces of the two airlines commenced.  [Id. at ¶34].  At the time of the merger, both the pilot groups at US Airways and America West were represented by the Air Line Pilots Association ("ALPA").  Pursuant to ALPA's internal policies, the issue of seniority integration of the two pilot groups was submitted to arbitration. On May 1, 2007, Arbitrator George Nicolau issued a seniority integration arbitration award (the "Nicolau Award").  [Id. at ¶37].  The Nicolau Award determined that the seniority lists should be merged in a manner that did not rely exclusively on length of service with the pre-merger employer, but rather also took into account factors such as the relative economic strength of the two airlines, a process which generally favored the more junior, pre-merger America West pilots. [Id. at ¶39].  Pursuant to ALPA's internal policy, the Nicolau award established the bargaining proposal which ALPA

was required to submit to the carrier in order to effectuate the integration of the pre-merger pilot groups. [Id. at ¶40].

Following the issuance of the Nicolau Award, pilots from the more senior pre-merger US Airways ("East pilots") began to lobby against the implementation of the Award, while the pilots from the pre-merger America West ("West pilots") began to lobby in favor of implementation. ALPA sponsored negotiations between the two groups, but these negotiations ultimately proved to be unsuccessful. Eventually, ALPA submitted the seniority list generated by the Nicolau Award to the carrier as ALPA's bargaining proposal. [Id. at ¶41].

In response to these developments, a group of East pilots formed the Plaintiff, USAPA, and sought to replace ALPA as the collecting bargaining representative of the pilots of the newly-merged US Airways. [Id. at ¶42]. During the election campaign, a group of West pilots formed AWAPPA for the stated purpose of "educat[ing] pre-merger America West pilots about USAPA and relevant events taking place, while providing recommendations that will ultimately lead to USAPA's downfall." [Id. at ¶44]. Another organization that was formed to oppose USAPA was Leonidas, LLC ("Leonidas"), which was organized in August 2007. [Id. at

¶45].  In May 2008, AWAPPA announced that "both AWAPPA and

Leonidas LLC have been in the process of combining our legal efforts to

best protect the interests of the America West pilots."  [Id. at ¶47].  In a

March 18, 2008, letter to West pilots, Defendant McIlvenna, a director of

both AWAPPA and Leonidas, declared "war against USAPA" and stated

that "there are plans in place to destroy USAPA should they prevail as our

bargaining agent."  [Id. at ¶48].

In an election organized by the National Mediation Board ("NMB")

under the provisions of the Railway Labor Act, which governs labor

relations in the airline industry, USAPA narrowly defeated ALPA, and on

April 18, 2008, USAPA was certified by the NMB as the collective

bargaining representative for all US Airways pilots.  [Id. at ¶¶49, 52].

Following the election, AWAPPA issued a press release stating that

AWAPPA had been formed to engage in an "aggressive strategy" against

USAPA, and that "USAPA's demise is just a matter of time."  [Id. at ¶50].

## B.    AWAPPA's Efforts to Destroy USAPA

USAPA alleges that since its certification as collective bargaining

representative on April 18, 2008, the Defendants and their co-conspirators

have engaged in "a concerted campaign of extortion and sabotage," which

activities are "designed to destroy USAPA and render it incapable of discharging its legal duty to represent the US Airways pilots." [Id. at ¶53]. The specific acts alleged to have been committed by the Defendants are discussed *seriatim*.

### 1. Sabotage of USAPA's Toll-Free Telephone Service

USAPA maintains a toll-free telephone service so that US Airways pilots may contact their collective bargaining representative free of charge. Part of this service includes a "hotline message," a pre-recorded message providing pilots with union updates and other relevant information. [Id. at ¶54]. USAPA alleges that the Defendants and their co-conspirators have encouraged West pilots to "sabotage USAPA's toll-free hotline by flooding it with frivolous calls." [Id. at ¶55]. Specifically, USAPA alleges that Defendant Krueger posted a message on the AWAPPA website messaging board ("AWAPPA Web Board") encouraging West pilots to call USAPA's toll-free number repeatedly. [Id.]. In a period of thirty-two days, nearly 14,000 calls were placed to the USAPA toll-free number, many of which were placed in succession from the same incoming number. [Id. at ¶57]. USAPA alleges that these frivolous calls were made "in a concerted effort to jam the service and impose unnecessary costs on USAPA." [Id. at

¶56]. At one point, USAPA was forced to discontinue the hotline message temporarily because of this activity. [Id.].

USAPA alleges that the Defendants and their co-conspirators are responsible for the deluge of frivolous phone calls to USAPA's toll-free number, and that the calls were "made with the malicious intent to incapacitate USAPA and waste its assets." [Id. at ¶58]. Specifically, USAPA alleges:

> • Defendant Cundari posted a message on the AWAPPA Web Board on April 30, 2008, encouraging other West pilots to call the USAPA toll-free number repeatedly. [Id. at ¶59];
>
> • Defendant Tooke made 393 calls to the USAPA toll-free number between April 24 and April 30, 2008. [Id. at ¶¶60, 61];
>
> • Defendant Krueger made 125 calls to the USAPA toll-free number between April 24 and April 30, 2008. [Id. at ¶62];
>
> • Defendant Cundari made approximately 2,318 calls to the USAPA toll-free number between April 19 and May 1, 2008. [Id. at ¶¶63, 64];
>
> • Defendant Auxier made 45 calls to the USAPA toll-free number, 33 of which were made between May 1 and May 7, 2008. Additionally, Auxier's postings on the AWAPPA Web Board end with the tagline, "Have you called [AWAPPA's toll-free number] 25 times today???" [Id. at ¶¶65, 66];

• Defendant Narloch made 30 calls to the USAPA toll-free number, 21 of which were made between April 25 and April 30, 2008.  [Id. at ¶67];

• Defendant Hannah made 65 calls to the USAPA toll-free number on April 30, 2008.  [Id. at ¶68];

• Defendant Maree made 28 calls to the USAPA toll-free number, 24 of which were made on April 25, 2008.  [Id. at ¶69];

• In response to a message posted on the AWAPPA Web Board expressing concern about the discussions of repeated dialing USAPA's toll-free number, Defendant Vasin posted a message on the AWAPPA Web Board stating, "No, it's ok to talk about dialing USAPA over and over."  [Id. at ¶72];

• In reference to a message published by USAPA encouraging USAPA members to learn about recent news by contacting the toll-free number, Defendant Braid posted a message on the AWAPPA Web Board stating, "Look they said it again.  Call often to stay informed.  Reach out and call from every pay phone you see.  What is the ambulance chaser talking about?  Acts of sabotage. They said to call."  [Id. at ¶73].

In addition to the deluge of calls to the toll-free number, USAPA alleges

that the Defendants and their co-conspirators have made numerous false

telephone calls to the USAPA Safety Hotline, a different toll-free telephone

line that US Airways pilots may use to report incidents or accidents to the

Union Safety Committee.  USAPA alleges that such false calls "endanger

the entire incident/accident reporting process, and, consequently, undermine passenger safety," because if the hotline system is flooded with false calls, "the contractor that provides the system may place less importance on following proper protocol, as established by the Union, designed to place Union representatives in immediate contact with an affected crew." [Id. at ¶¶75, 76]. USAPA states that it is unaware of the extent and exact amount of damages suffered as a result of the Defendants' sabotage of the toll-free phone service. [Id. at ¶77]. USAPA alleges that, despite the filing of this civil action, the Defendants and their co-conspirators have continued to publish messages on AWAPPA's Web Board encouraging and promoting the continued sabotage of USAPA's toll-free telephone line. [Id. at ¶¶126-40]. It is noted that unlike the allegations concerning the calls to the toll-free informational number, the Plaintiff makes no specific allegations of any of the named Defendants making repeated, or any, calls to the Safety Hotline. Plaintiff only makes the very general allegation that this was done by the Defendants and their co-conspirators.

## 2. Use of Profane and Threatening Language in Voicemail Messages

USAPA alleges that the Defendants and their co-conspirators "have used profane, indecent, vulgar and threatening language in telephone voicemail messages" in an effort to intimidate and harass USAPA, its officers, and individual US Airways pilots. [Id. at ¶¶78-82]. The four calls specifically identified in the Amended Complaint were directed to USAPA's officers and/or employees. These calls are identified only by the telephone number from which the call was made, and there is no allegation that any of them were placed by or encouraged by any named Defendant.

## 3. Threatening and Harassing Communications to US Airways Pilots

USAPA alleges that the Defendants and their co-conspirators have made threatening and harassing communications to US Airways Pilots, asserting that these pilots' safety and/or employment rights will be jeopardized if they continue to pay dues to or participate in the operation of USAPA. [Id. at ¶¶83-89]. The specific acts of threatening and harassing communications are as follows:

> • On April 22, 2008, Defendant McIlvenna sent an e-mail to an unidentified US Airways pilot, stating, "I hope the pilot group does not know about your plan

to pay USAPA dues and join as a member, else I fear for your safety."  [Id. at ¶84];

• A message posted on the AWAPPA Web Board listed the telephone number of an unidentified US Airways pilot who was interested in becoming a USAPA representative, along with the suggestion that a "couple HUNDRED strongly worded [telephone] messages" may deter his participation in USAPA.  The pilot subsequently decided not to become a USAPA representative.  The pilot sought the assistance of US Airways in dealing with multiple threats that he received by phone and e-mail in response to his interest in becoming an USAPA representative, including a threatening e-mail from Defendant Abbott on May 12, 2008, inquiring as to when a "blanket party" (a method of assault wherein the victim is covered by a blanket while being attacked) would be held for this pilot. This same pilot also has been subjected to threats by "multiple pilots" to put him on a "no fly" list.  [Id. at ¶¶85, 86];

• On May 9, 2008, a doll with "USAPA" written on it was found hanging from a noose in a cockpit of a US Airways plane in St. Louis, Missouri.  [Id. at ¶87];

• In May 2008, a sticker was discovered in a jetway in Charlotte, North Carolina, referring to USAPA as "scabs."  [Id. at ¶88];

• The United States Postal Service has informed USAPA that "injurious articles," such as rocks and feces, have been sent through the mail to USAPA's post office box.  [Id. at ¶89].

### 4.    Conspiracy to Violate Union Security Provision

USAPA alleges that the Defendants have engaged "in a concerted effort to interfere with the contractual relationship between USAPA and US Airways by coercing US Airways into violating the union security provisions of the collective bargaining agreement," which provisions require all pilots to pay union dues or agency fees to USAPA or face discharge from their employment.  [Id. at ¶¶90, 91].  Specifically, USAPA alleges that the Defendants and their co-conspirators "have conspired to create a mass violation of the contractual dues obligation by encouraging former America West pilots to refuse to pay dues or agency fees to USAPA, and thereby leverage US Airways into refusing to enforce the union security provisions." [Id. at ¶91].  USAPA cites to numerous postings on the AWAPPA Web Board discussing the non-payment of dues to USAPA by West pilots, including postings by Defendants Szmal, Maree, Doyal, Diehl, Heil, and Steele. [Id. at ¶¶92-102].  The Defendants' promotion of a scheme to have the former America West pilots refuse to pay union dues or agency fees has resulted in the loss of dues and fees income to USAPA in the approximate amount of $298,000 per month. [Id. at ¶104].

### 5. Filing of Frivolous Grievances

USAPA further alleges that the Defendants have encouraged former America West pilots to file frivolous grievances in order to waste USAPA's assets. [Id. at ¶105]. Specifically, USAPA alleges that a former America West pilot, Tony Lozano (who is not a party to this action), posted a message on the AWAPPA Web Board encouraging pilots to file "an obscene amount of grievances," so as to force USAPA to incur the expense of defending them. [Id. at ¶106]. The Amended Complaint does not allege whether such frivolous grievances were in fact filed.

### 6. Imposition of Costs Through Deceptive Use of U.S. Mail

USAPA alleges that the Defendants "have conspired to deceptively manipulate [sic] the U.S. Postal Service in order to impose unnecessary costs on USAPA," including the return of mail sent by USAPA with the false notation that the recipient can no longer be found at the address and the mailing, without postage, of empty envelopes addressed to and from USAPA so that USAPA will be required to pay the postage. [Id. at ¶¶107, 108, 111]. USAPA cites several postings on the AWAPPA Web Board, including a posting from Defendant Trimmer, encouraging these tactics. [Id. at ¶¶109-12].

## 7.    Jump Seat Boycott

USAPA alleges that the Defendant and their co-conspirators have engaged in a concerted effort to deprive USAPA members the ability to commute to work by denying them the use of the cockpit "jump seat" on flights flown by West pilots and flights flown by pilots at other carriers.  [Id. at ¶113].  USAPA cites to several postings on the AWAPPA Web Board which indicate the active solicitation of pilots at US Airways and other airlines to deny the jump seat to USAPA members, including the following postings:

> • A posting on April 19, 2008 by Defendant Gabaldon stating, "I will NOT allow any scab to ride my jumpseat (in the interest of safety) .... I'm networking all of ALPA friends at other carriers to put forth motions before their MEC's to deny jumpseats to ALL USCABAS." [Id. at ¶116];

> • A posting on April 28, 2008 by Defendant Auxier stating, "Hey, the UAL guys have the balls to deny the Eastholes, the least we can do is follow suit. They are the pariahs of the industry, and frankly I think it IS unsafe to have them on our jumps ...." [Id. at ¶117];

> • A posting on April 22, 2008 by Defendant Metzker, stating, "I passed along our jumpseat concerns to a friend at Alaska ... and told him how to tell an America West pilot apart by looking for the P number on the back our id, right corner.  He passed

it along to his MEC chair along with the link to our AWAPPA donate page." [Id. at ¶119];

• A posting on May 14, 2008 by Defendant Vasin, relating a message received on the AWAPPA website from an American Eagle pilot who wrote, "Hi, Eagle guys have the Pxxxx information for jumpseat usage, so you guys should be fine. Best of luck, I have a lot of friends with your airline." [Id. at ¶119].

USAPA alleges that the denial of jump seats to USAPA members has resulted in US Airways pilots being unable to commute to the cities in which their scheduled flights were to originate. [Id. at ¶120].

## 8.    Defamatory Statements

USAPA alleges that AWAPPA has published false statements regarding USAPA on the AWAPPA Web Board, including statements that USAPA "failed to tell their membership that no further negotiations would take place (they planned on striking a deal exchanging the stapling of the west pilots for a concessionary contract)"; that "former [America West] pilots are totally unprotected with no rep's or committees staffed out west"; and "our grievances have been dropped by the new scab union imposed on us." [Id. at ¶121]. Additionally, USAPA alleges that the Defendants and their co-conspirators have sent false and defamatory e-mail messages from the e-mail address "usailinepilots.org" (deleting the single letter "r"

from the standard USAPA electronic address) to make it appear as if such messages were sent from USAPA officers, and that the Defendants and their co-conspirators have arranged for USAPA officers to receive subscriptions to sexually-related electronic services. [Id. at ¶¶ 122-24]. These actions have resulted in USAPA officers being unable to communicate effectively with union members, due to malfunctioning e-mail accounts resulting from the flood of unauthorized subscription correspondence. [Id. at ¶125]. Once again, the Plaintiff does not allege these acts to have been committed by any named Defendant, but only "by the Defendants and their co-consirators."

## III.   PROCEDURAL BACKGROUND

USAPA filed the present action on May 30, 2008. [Doc. 1]. An Amended Complaint was filed on June 16, 2008. [Doc. 39]. In the Amended Complaint, USAPA alleges that the Defendants and their co-conspirators have engaged in multiple acts of extortion, as defined by the Hobbs Act, 18 U.S.C. §1951, "in furtherance of their scheme to destroy USAPA, deprive USAPA of property, and to obtain property from USAPA and its members induced by wrongful use of actual or threatened force,

violence, fear, or sabotage." [Id. at ¶144]. Counts One and Two of the Amended Complaint allege violation of sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). [Id. at ¶¶154-75]. Additionally, the Amended Complaint asserts several state law claims, including claims for a violation of Section 75D-4 of the North Carolina Influenced and Corrupt Organizations Act ("NC RICO") [Id. at ¶¶176-86]; NC RICO conspiracy [Id. at ¶¶187-95]; violation of Section 75-1.1 of the North Carolina Unfair and Deceptive Trade Practices Act [Id. at ¶¶196-202]; trespass to chattels [Id. at ¶¶203-07]; tortious interference with contractual relations [Id. at ¶¶208-11]; civil conspiracy [Id. at ¶¶212-17]; defamation (against AWAPPA only) [Id. at ¶¶218-22]; defamation (against all Defendants) [Id. at ¶¶223-28]; and a claim for punitive damages pursuant to N.C. Gen. Stat. §1D-15 [Id. at ¶¶229-34]. USAPA seeks an award of compensatory damages, punitive damages, and preliminary and permanent injunctive relief.

On June 18, 2008, the AWAPPA Defendants filed a Motion to Dismiss the USAPA's Amended Complaint, asserting a lack of subject matter jurisdiction over the Plaintiff's federal claims. [Doc. 42]. USAPA filed a response in opposition to this motion on June 25, 2008, [Doc. 84],

and the AWAPPA Defendants filed their reply brief on June 26, 2008 [Doc. 86].

On June 19, 2008, USAPA filed a Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 63]. On June 23, 2008, the Court set both the AWAPPA Defendants' Motion to Dismiss and USAPA's Motion for Temporary Restraining Order and Preliminary Injunction for hearing on June 27, 2008. [Doc. 68]. The AWAPPA Defendants and the Individual Defendants filed responses in opposition to USAPA's motion for injunctive relief on June 25, 2008. [Docs. 82, 83].

On June 24, 2008, the Individual Defendants filed a Motion to Dismiss and Joinder in Motion to Dismiss Filed by AWAPPA Defendants, asserting as grounds a lack of subject matter jurisdiction, a lack of personal jurisdiction, and improper venue. [Doc. 77]. USAPA filed a response in opposition to this motion on July 1, 2008. [Doc. 92]. Additionally, in response to the Defendants' Motions to Dismiss, USAPA filed a Motion for Leave to Amend the First Amended Verified Complaint on June 25, 2008. [Doc. 80].

The Court conducted a hearing on these matters on June 27, 2008, and the issues were fully argued. The parties were afforded the

22

opportunity to submit evidence on the record in support of their positions with respect to USAPA's request for injunctive relief. The Court granted the parties leave to make limited supplemental filings regarding the Motions to Dismiss, which have been filed. [Docs. 89, 91, 92]. Accordingly, the Court finds that these matters have been fully briefed and argued and are now ripe for disposition.

## IV.    SUBJECT MATTER JURISDICTION

### A.    Positions of the Parties

The AWAPPA Defendants argue that the Amended Complaint fails to state a federal RICO claim because the facts alleged do not constitute acts of extortion. Specifically, the AWAPPA Defendants argue that the Amended Complaint fails to allege the essential element of extortion that the Defendants have attempted to obtain from USAPA something of value with its consent. They further contend that the Amended Complaint fails to establish a "pattern" of racketeering activity. These Defendants argue that USAPA cannot establish continuity of such activity based on either a "closed-ended" pattern or an "open-ended" pattern of continued racketeering activity. Accordingly, the AWAPPA Defendants argue, the

federal RICO claims must be dismissed.  The AWAPPA Defendants further

argue that because the only jurisdictional basis for this action is the

existence of a federal question pursuant to 28 U.S.C. §1331[1], the Court

should, with the dismissal of the federal RICO claims, decline to exercise

supplemental jurisdiction over the state law claims pursuant to 28

U.S.C. §1367(c)(3).  [Doc. 43].

The Individual Defendants join in the AWAPPA Defendants' Motion

to Dismiss on the grounds that the Amended Complaint fails to state a

federal RICO claim.  In addition to the issues raised by the AWAPPA

Defendants, the Individual Defendants argue that the federal RICO claims

asserted in the Amended Complaint must fail because acts taken in

connection with legitimate labor activities cannot serve as a basis for a

Hobbs Act violation.  They further argue that the Amended Complaint fails

to allege with the requisite specificity that any of the individual Defendants

(1) engaged in an "enterprise," (2) engaged in a "pattern of racketeering

---

[1]The Amended Complaint asserts both the existence of a federal question and diversity as grounds for the existence of subject matter jurisdiction in this case. [Doc. 39 at ¶31].  USAPA, however, subsequently withdrew its reliance on diversity as a grounds for subject matter jurisdiction [Doc. 84 at 2], and thus, the only possible basis for subject matter jurisdiction in this matter is the existence of a federal question pursuant to 28 U.S.C. §1331.

activity," or (3) "conspired" to do any act within the meaning of RICO. [Doc. 78].

USAPA opposes both Motions to Dismiss, arguing that the Amended Complaint adequately states a federal RICO claim. With respect to the arguments made by the AWAPPA Defendants, USAPA argues that the factual averments in the Amended Complaint clearly imply the Defendants' attempt to obtain property from USAPA with its consent, and that the failure to make an explicit "consent" assertion is a mere technicality which is easily cured by an amendment of the Amended Complaint. Further, USAPA argues that it has alleged an ongoing scheme to continue extortion to impose AWAPPA's interests on the bargaining unit, and thus has satisfied the requirement of alleging an "open-ended" pattern of racketeering activity by the Defendants' enterprise. [Docs. 84, 92].

## B. Analysis

The Racketeer Influenced and Corrupt Organizations Act ("RICO" or "Act"), 18 U.S.C. §§ 1961, *et seq.* establishes civil and criminal liability for those who engage in "a pattern of racketeering activity." 18 U.S.C. §1962. To state a RICO claim, a plaintiff must allege the following elements: "(1) the defendant's employment by or association with (2) an 'enterprise' (3)

engaged in or affecting interstate commerce (4) the affairs of which the defendant conducts or participates in through a pattern of racketeering activity."  <u>Dtex, LLC v. BBVA Bancomer, S.A.</u>, 405 F.Supp.2d 639, 649 (D.S.C. 2005), <u>aff'd</u>, 214 Fed. Appx. 286 (4th Cir. 2007).  A "pattern of racketeering activity" requires at least two acts of "racketeering activity" committed within ten (10) years of each other.  18 U.S.C. §1961(5). The Act defines "racketeering activity" as "any act or threat involving," among other things, certain criminal offenses under federal and state law, including the crime of extortion under the Hobbs Act, 18 U.S.C. §1951.  <u>See</u> 18 U.S.C. §1961(1).  The only such predicate offenses the Plaintiff asserts are actions it argues violate the Hobbs Act.  The Hobbs Act defines "extortion" as

> the *obtaining* of *property* from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear ....

18 U.S.C. §1951(b)(2) (emphasis added).

### 1.    Allegations of Extortion

In the Amended Complaint, USAPA alleges that the Defendants and their co-conspirators have engaged in the following acts of extortion, including:

(1) the sabotage of USAPA's toll-free telephone service by making repeated frivolous calls [Doc. 39 at ¶¶54-77];

(2) the use of profane, indecent, and threatening language in telephone voicemail messages to USAPA officers [Id. at ¶¶78-82];

(3) threatening and harassing communications to other US Airways pilots, asserting that their safety and/or employment rights will be jeopardized if they continue to support USAPA [Id. at ¶¶83-89];

(4) a conspiracy to discourage former America West pilots from paying dues or agency fees to USAPA, thereby coercing US Airways into violating the union security provisions of the collective bargaining agreement [Id. at ¶¶90-104];

(5) the imposition of unnecessary costs by encouraging former America West pilots to file frivolous grievances [Id. at ¶¶105-06];

(6) the imposition of unnecessary costs by deceptive use of the U.S. Mail [Id. at ¶¶107-112];

(7) the active solicitation and encouragement of former America West pilots and others to deprive USAPA members the ability to commute to work by denying them the use of the cockpit "jump seat" [Id. at ¶¶113-20]; and

(8) the publishing of false statements concerning USAPA on AWAPPA's Web Board, the false attribution of defamatory statements to USAPA officers, and the malicious arrangement of sexually-related electronic subscription services in the names of USAPA's officers [Id. at ¶¶121-25].

USAPA alleges that these acts were performed in order "to destroy USAPA, and to obtain from USAPA the right to represent the pilots of US Airways, the right to collect membership dues and agency fees from the pilot group, and the right to determine the pilots' terms and conditions of employment, including the terms under which the seniority lists of East and West pilots would be integrated."  [Id. at ¶147].

Until recently, the phrase "the obtaining of property from another" as found in the Hobbs Act was construed broadly by the courts.  The term "property" has been interpreted to include intangible as well as tangible property rights.  See United States v. Santoni, 585 F.2d 667, 673 (4th Cir. 1978) (recognizing intangible right "to make a business decision free from outside pressure wrongfully imposed" constitutes property within meaning of Hobbs Act), cert. denied, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1999); United States v. Tropiano, 418 F.2d 1069, 1075-76 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970) (recognizing right to solicit business free of wrongfully imposed territorial restrictions as "property" under Hobbs Act); see also United States v. Bellomo, 176 F.3d 580, 592-93 (2d Cir. 1999) (recognizing right of union members to participate in union election constitutes "property" under

Hobbs Act), cert. denied sub nom. Ida v. United States, 528 U.S. 987, 120 S.Ct. 447, 145 L.Ed.2d 364 (1999).  Similarly, the term "obtaining" was broadly construed to encompass acts constituting interference with or deprivation of a person's property rights, even if the defendant did not seek to exercise those rights for itself.  See, e.g., United States v. Arena, 180 F.3d 380, 394 (2d Cir. 1999) (in case involving anti-abortion protestors who attempted to shut down clinic, "obtaining" element was satisfied where defendant committed or threatened acts of violence and harm in order to induce victim to abandon its right to conduct business free from threats of violence and harm).

In 2003, however, the Supreme Court significantly restricted the scope of the phrase "the obtaining the property from another" in Scheidler v. National Organization for Women, Inc., 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003) ("Scheidler II").[2]  In that case, the Supreme Court faced facts similar to those in Arena, namely, anti-abortion protestors who

---

[2]To date, the Scheidler case has journeyed to the Supreme Court on three occasions: National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ("Scheidler I"); Scheidler v. National Organization for Women, Inc., 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003) ("Scheidler II"); and Scheidler v. National Organization for Women, Inc., 547 U.S. 9, 126 S.Ct. 1264, 164 L.Ed.2d 10 (2006) ("Scheidler III").  Although Scheidler I and Scheidler III are not implicated by the facts of this case, the Court will continue to refer to the above-cited case as "Scheidler II" for ease of reference.

were attempting to shut down abortion clinics.  <u>Scheidler II</u>, 537 U.S. at

398, 123 S.Ct. at 1062.  The respondent clinics argued that the petitioners

had violated the Hobbs Act by "seeking to get control of the use and

disposition of respondents' property."  <u>Id.</u> at 401, 123 S.Ct. at 1063-64.

Specifically, the respondents argued "that because the right to control the

use and disposition of an asset is property, petitioners, who interfered with,

and in some instances completely disrupted, the ability of the clinics to

function, obtained or attempted to obtain respondents' property."  <u>Id.</u> at

401, 123 S.Ct. at 1064.  The Supreme Court rejected the respondents'

characterization of the petitioners' actions as an "obtaining of property

from" the clinics, stating as follows:

> [E]ven when their acts of interference and
> disruption achieved their ultimate goal of "shutting
> down" a clinic that performed abortions, such acts
> did not constitute extortion because petitioners did
> not "obtain" respondents' property.  Petitioners may
> have deprived or sought to deprive respondents of
> their alleged property right of exclusive control of
> their business assets, *but they did not acquire any
> such property.  Petitioners neither pursued nor
> received something of value from respondents that
> they could exercise, transfer, or sell.*  To conclude
> that such actions constituted extortion would
> effectively discard the statutory requirement that
> property must be obtained from another, replacing it
> instead with the notion that merely interfering with

or depriving someone of property is sufficient to
constitute extortion.

Id. at 404-05, 123 S.Ct. at 1065-66 (internal citation and quotation marks

omitted) (emphasis added).  As the Second Circuit recently explained,

Scheidler II makes clear that it is not enough to show merely that there was

a deprivation or interference with the plaintiff's property right; rather, in

order to show that a property right was "obtained", there must be both

deprivation and acquisition of the property:

> We read the Court's emphasis on the possibility of
> exercising, transferring, or selling the property as a
> concern with the extortionist's intent with respect to
> the property at issue.  The ultimate goal of the anti-
> abortion protestors in Scheidler II was merely
> shutting down a clinic that performed abortions.
> This did not constitute acquisition in the eyes of the
> Scheidler II Court, we believe, because there was
> no further intended activity on the part of the
> protestors, and mere interference with the clinics'
> right to conduct their business, even to the point of
> getting them to cease conducting their business
> altogether, was closer to coercion than extortion.
> But had the protestors sought to take further action
> after having deprived the clinics of their right to
> conduct their business as they wished – by, for
> example, forcing the clinic staff to provide different
> types of services, forcing the clinic to turn its
> operations over to the protestors, or selling the
> clinic or its property to a third party, we believe that
> they would have satisfied the Scheidler II Court's
> definition of "obtaining."

United States v. Gotti, 459 F.3d 296, 323-24 (2d Cir. 2006) (internal

citation, quotation marks, and footnote omitted), cert. denied sub nom.

Ciccone v. United States, 127 S.Ct. 3001, 168 L.Ed.2d 726 (2007).

In the present case, USAPA has asserted that the Defendants are

attempting to destroy USAPA and to obtain from the union and its

members various intangible property rights, including USAPA's right to

serve as the collective bargaining representative for the US Airways pilots;

USAPA's right to collect membership dues and agency fees from the pilot

group; the rights of USAPA members to exercise rights under the Labor-

Management Reporting and Disclosure Act, 29 U.S.C. §401, *et seq*.; and

USAPA's right to determine the pilots' terms and conditions of

employment, including the terms under which the seniority lists of the East

pilots and West pilots will be integrated. [Doc. 39 at ¶¶144-147]. The

Defendants do not dispute that USAPA has satisfied the "property" prong

of the Hobbs Act with these allegations, [Doc. 86 at 3-4], and the Court

agrees that a property right has been alleged sufficiently.

Where USAPA's allegations fall short, however, is in satisfying the

"obtaining" prong of the extortion statute. The Amended Complaint is

replete with allegations that the Defendants' actions have deprived USAPA

of its property rights and have interfered with the exercise of such rights to such an extent that the union's ability to continue its representation of the collective bargaining unit has been compromised. <u>See</u> Amended Complaint, Doc. 39 at ¶¶51, 53, 144-47. It cannot be reasonably inferred from the factual allegations in the Amended Complaint, however, that in so doing, the Defendant acquired or attempted to acquire any of these claimed rights from USAPA. Even assuming the truth of USAPA's allegations – that the Defendants sought to destroy USAPA and deprive it of its right to represent the collective bargaining unit – such allegations merely establish that the Defendants sought to deprive the union of these property rights. Without an allegation that the Defendants sought to *acquire* these rights, the Amended Complaint fails to allege facts from which the Court can conclude that the Defendants "pursued nor received something of value from [USAPA] that they could exercise, transfer, or sell." <u>Scheidler II</u>, at 405, 123 S.Ct. at 1066. Like the anti-abortion protestors in <u>Scheidler II</u>, whose ultimate goal was to shut down the respondent abortion clinics, the Plaintiff alleges that the ultimate goal of the Defendants in this case is "to destroy USAPA and render it incapable of discharging the legal duty to represent the US Airways pilots" by attempting

to drive up USAPA's costs of doing business (such as sabotaging the toll-free phone service, filing frivolous grievances, and imposing unnecessary postage costs) and by driving down its revenues (by attempting to intimidate pilots who paid dues or otherwise supported USAPA, by acting in concert to refuse to pay dues to USAPA, and by engaging in a "jump seat boycott" of USAPA members).  [Doc. 39 at ¶53].  While such allegations clearly establish an attempt to deprive or interfere with USAPA's property rights, they fail to meet the element of AWAPPA and the other Defendants attempting to *acquire* those rights from USAPA.  The stated goal of AWAPPA is clear; since its formation, AWAPPA has sought to destroy USAPA and render it incapable of continuing in its capacity as the representative of the US Airways pilots.  [Id.].  With these stated goals, AWAPPA does not stand to receive something of value from USAPA that AWAPPA could "exercise, transfer, or sell."  See Scheidler II, 537 U.S. at 405, 123 S.Ct. at 1066.  Absent allegations that the Defendants "obtained" property rights from USAPA, the Amended Complaint at best states a claim for coercion.  As the Scheidler II Court explained, "[t]he crime of coercion ... involves the use of force or threat of force to restrict another's

freedom of action," and is not a crime within the scope of the Hobbs Act, Id., and thus is insufficient to support a civil claim under RICO.

Because the Plaintiff has failed to allege facts which could give rise to a plausible claim finding that the Defendants acquired or attempted to acquire property rights from USAPA, the Court concludes that the Plaintiff has failed to satisfy the "obtaining" prong of the extortion statute.

### 2. Allegations of a "pattern" of racketeering activity

Even assuming that the Plaintiff could establish that the Defendants had engaged in the predicate acts of extortion, the Plaintiff is also required to make sufficient allegations that the Defendants' conduct constituted a "pattern of racketeering activity" within the meaning of the RICO statutes.

As stated previously, a "pattern of racketeering activity" requires "at least two acts of racketeering activity." 18 U.S.C. §1961(5). "While a minimum of two predicate acts is required, two acts alone do not necessarily establish a pattern." GE Investment Private Placement Partners II v. Parker, 247 F.3d 543, 549 (4th Cir. 2001). In order to establish a "pattern" within the meaning of the Act, a plaintiff must demonstrate "that the predicate acts are related and that they 'amount to or pose a threat of continued criminal activity.'" Id. (quoting H.J. Inc. v.

Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989)).  The parties in the present case do not dispute that the alleged predicate acts are related, and the Court agrees that the facts alleged in the Amended Complaint satisfy the relatedness requirement. Thus, the question becomes whether USAPA has sufficiently alleged facts regarding the element of "continuity."

As the Supreme Court has explained, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  H.J., 492 U.S. at 241, 109 S.Ct. at 2902.  In either case, continuity is "a temporal concept"; a party alleging a RICO violation may show closed-ended continuity "by proving a series of related predicates extending over a substantial period of time."  Id. at 242, 109 S.Ct. at 2902.  However, predicate acts that extend only over a few weeks or months, and which do not threaten future acts of criminal conduct, "do not satisfy this requirement."  Id.  Plaintiff's counsel conceded at oral argument that because the alleged predicate acts occurred over the course of only a few months (from April, 2008 to the present), closed-ended continuity cannot be shown in this case.  The Plaintiff argues, however,

that it has sufficiently alleged open-ended continuity. The Supreme Court has stated that open-ended continuity may by shown, for example, where the "related predicates themselves involve a distinct threat of long-term racketeering activity," or where the predicate acts "are part of an ongoing entity's regular way of doing business ... or of conducting or participating in an ongoing and legitimate RICO enterprise." Id. at 242-43, 109 S.Ct. at 2902.

After considering all of the allegations in the Amended Complaint, the Court concludes that the facts asserted by the Plaintiff are inadequate to meet the requisite open-ended continuity. USAPA has alleged that the Defendants' conduct was aimed entirely at a single goal: "to destroy USAPA and render it incapable of discharging its legal duty to represent the US Airways pilots." [Doc. 39 at ¶53; see also ¶51 ("Defendants and their co-conspirators seek to destroy USAPA"); ¶144 (alleging "acts of extortion ... in furtherance of [defendants'] scheme to destroy USAPA"); ¶146 (referring to "act[s] of extortion in connection with the described scheme to destroy USAPA"); ¶147 ("The common purpose of these multiple racketeering acts was to destroy USAPA...."); ¶148 ("a calculated series of repeated violations of law in order to destroy USAPA")]. As the

District Court for the District of South Carolina recently explained, "The Fourth Circuit has consistently held that RICO's pattern requirement is not satisfied where, as here, the alleged scheme is narrowly focused on one goal and will end when and if that goal is accomplished." Dtex, 405 F.Supp.2d at 650. Thus, where the alleged racketeering activity "has a built-in ending point, ... the case does not present the necessary threat of long-term, continued criminal activity." GE Investment, 247 F.3d at 549 (no open-ended continuity where scheme was exclusively focused on the sale of a controlling interest in a company); see also Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989) (finding no continuity where "Defendants' actions were narrowly directed towards a single fraudulent goal"). As such, there is no basis for finding the threat of continued criminal activity that is necessary to establish a "pattern of racketeering activity" in this case. Plaintiff's federal RICO claims therefore fail for this reason as well.

### 3. Plaintiff's Motion to Amend Complaint

In response to the Defendants' Motions to Dismiss, the Plaintiff seeks leave to file a Second Amended Verified Complaint. The Plaintiff proposes to assert additional factual allegations in order (1) "to clarify and

make the 'consent' element [of the RICO actions] explicit"; (2) "to clarify

that defendants have threatened to continue their acts of racketeering over

a substantial period of time, and to allege that the racketeering acts

committed by AWAPPA are part of AWAPPA's regular way of doing

business"; and (3) "to delete the assertion of diversity jurisdiction, while

leaving intact the federal question jurisdiction based on RICO, thus

rendering AWAPPA's argument [regarding the lack of diversity between the

parties] moot."  [Doc. 81 at 2-3]

Rule 15(a) of the Federal Rules of Civil Procedure provides that the

Court "should freely give leave [to amend pleadings] when justice so

requires."  Fed. R. Civ. P. 15(a).  "In the absence of any apparent or

declared reason – such as undue delay, bad faith or dilatory motive on the

part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, futility of amendment, etc. – the leave sought

should, as the rules require, be 'freely given.'"  Foman v. Davis, 371 U.S.

178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Upon reviewing the Plaintiff's proposed Second Amended Verified

Complaint, the Court concludes that the Plaintiff's proposed amendments

would be futile.  The Court has determined that the Plaintiff has failed to make sufficient factual allegations to make out the elements of extortion under the Hobbs Act; the inclusion of additional factual allegations regarding the "consent" element of this crime would not change this result. Further, the Court has determined that the Plaintiff has failed to make sufficient factual allegations regarding the continuity of the Defendants' activities to meet the requirement regarding a "pattern of racketeering activity."  The proposed addition of some conclusory allegations regarding the threat of continued acts in the future and AWAPPA's regular way of doing business has no effect on the Court's conclusion that the Plaintiff has failed to make adequate allegations to meet the requirements of open-ended continuity because the Defendants' alleged racketeering activity has "a built-in ending point."  GE Investment, 247 F.3d at 549.  Finally, the Plaintiff's proposed deletion of any allegations regarding the diversity jurisdiction is unnecessary, as the Court has determined that this case should be dismissed for a lack of federal question jurisdiction.  For these reasons, the Court concludes that the Plaintiff's proposed amendments would be futile, and for that reason, the Plaintiff's Motion for Leave  to Amend First Amended Verified Complaint [Doc. 80] will be denied.

**4.    Exercise of Supplemental Jurisdiction**

Having abandoned its assertion that an alternative basis of jurisdiction lies in the diversity of citizenship between the parties, the only basis for subject matter jurisdiction asserted by the Plaintiff is the existence of a federal question pursuant to 28 U.S.C. §1331. Because the Court has determined that the Plaintiff has failed to state a claim under RICO, these claims must be dismissed. Because these RICO claims were the only federal causes of action asserted in the Amended Complaint, the Defendants urge the Court to decline to exercise supplemental jurisdiction over the various state-law claims pleaded in the Amended Complaint.

Section 1367 of Title 28 provides that the Court may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The Fourth Circuit has held that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished."  Jordahl v. Democratic Party of Virginia, 122 F.3d 192, 203 (4th Cir. 1997) (quoting Shanagan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1993)), cert. denied, 552 U.S. 1077, 118 S.Ct. 856, 139 L.Ed.2d 756 (1998).

The Court has dismissed the Plaintiff's only federal claims, leaving numerous claims which call for the application of state law.  As the Supreme Court has stated:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by providing for them a surer-footed reading of applicable law.  Certainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (footnotes omitted).  For this reason, the Court in its discretion declines to exercise supplemental jurisdiction over the remaining state claims pursuant to 28 U.S.C. § 1367(c)(3).  Accordingly, the Plaintiff's remaining state law claims will be dismissed without prejudice so that these claims may be re-filed in the appropriate state court.

## V.    PERSONAL JURISDICTION AND VENUE

In addition to the lack of subject matter jurisdiction, the Individual Defendants argue, as additional grounds for their dismissal, that they are not subject to personal jurisdiction in North Carolina, as they are not residents of North Carolina, nor have they had continuous and systematic contacts in North Carolina such that the exercise of *in personam* jurisdiction would be warranted.  Further, the Individual Defendants argue that this matter should be dismissed and/or transferred pursuant Rule 12(b)(3) of the Federal Rules of Civil Procedure for improper venue because none of the acts alleged in the Amended Complaint are alleged to have occurred in North Carolina.  [Doc. 78].

Having determined that this action should be dismissed on the grounds that the Plaintiff has failed to state a federal claim and therefore the Court lacks subject matter jurisdiction on the basis of a federal question, and further having exercised its discretion in declining to exercising supplemental jurisdiction over the Plaintiff's state-law claims, the Court need not address the Individual Defendants' arguments with respect to personal jurisdiction and venue.  If it were necessary to reach such issues, the Court would have serious concerns as to whether the exercise

of *in personam* jurisdiction over the Individual Defendants would comport with the requirements of due process.  See ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997) (assertion of jurisdiction over defendant must be "compatible with due process"), cert. denied, 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998).  Upon reviewing the Amended Complaint, the Court notes that there is a paucity of allegations to support the Court's assertion of jurisdiction over each of the Individual Defendants.  Further, the Court questions whether the actions alleged to have been committed by these Defendants – the making of phone calls to USAPA's hotline and the posting of messages on AWAPPA's Web Board – would support a finding that "a substantial part of the events" giving rise to the Plaintiff's claims arose in this District.  See 28 U.S.C. §1391(b). Because the Court has dismissed the Plaintiff's claims based on a lack of subject matter jurisdiction, however, such issues need not be reached.

## VI.   INJUNCTIVE RELIEF

The Plaintiff USAPA moves for the entry of a temporary restraining order and a preliminary injunction ordering the Defendants to refrain from committing the type of harassing and threatening acts as outlined in the

Amended Complaint. [Doc. 63]. The Plaintiff's Amended Complaint raises serious allegations against the Defendants; it alleges acts of intimidation, harassment, and other threatening behavior against the Plaintiff and its members. While the Court has concluded that such actions do not come within the purview of RICO, it may well be that a Court of appropriate jurisdiction will conclude that such actions do constitute violations of state law and that injunctive relief is warranted to prevent this type of conduct from continuing. Because the Court has concluded that subject matter jurisdiction does not lie, however, the Court need not reach the issue of whether injunctive relief would be appropriate based on the facts presented in this case. Accordingly, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 63] will be denied as moot.

## VII.  CONCLUSION

The Plaintiff's allegation that the Defendants' purpose is to "destroy USAPA" undermines the Plaintiff's RICO claims in two respects. By asserting that the Defendants' goal is the destruction of the Plaintiff itself, the Plaintiff fails to meet the continuity requirement of RICO and also fails to allege adequately an essential element of extortion, namely, that the

Defendants seek to "obtain" the Plaintiff's "property."  For these reasons, the Court concludes that Counts One and Two of the Plaintiff's Amended Complaint fail to state a claim upon which relief can be granted, and accordingly, these claims are dismissed.  Because the federal claims asserted by the Plaintiff have been dismissed, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state-law claims pursuant to 28 U.S.C. §1367(c)(3), and these claims are therefore dismissed without prejudice.  The Plaintiff's request for leave to file its proposed Second Amended Complaint is futile and therefore is denied. Finally, the Plaintiff's requests for a temporary restraining order and a preliminary injunction are rendered moot by the dismissal of the Plaintiff's state-law claims, and for that reason are denied.

Accordingly, **IT IS, THEREFORE, ORDERED** that the Motion to Dismiss of Defendants AWAPPA, McIlvenna, Vasin, Blandino, Ferguson, Koontz, and Payne [Doc. 42] and the Motion to Dismiss by Individual Defendants Eric Auxier, David Braid, Al Casby, Christopher Cundari, Larry Diehl, Ron Gabaldon, Bruce A. Hannah, Keith Krueger, Robert J. Narloch, Shawn Metzker, CJ Szmal, Kevin Steele, and Jack Tooke, and Joinder in

Motion to Dismiss Filed by AWAPPA Defendants [Doc. 77] are **GRANTED** to the extent that Counts One and Two of the Amended Complaint are **DISMISSED WITH PREJUDICE** pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Because the federal claims asserted by the Plaintiff have been dismissed, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state-law claims (Counts Three through Eleven) pursuant to 28 U.S.C. §1367(c)(3), and accordingly, **IT IS FURTHER ORDERED** that these claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Leave to Amend First Amended Verified Complaint [Doc. 80] is **DENIED** as futile.

**IT IS FURTHER ORDERED** that to the extent that the Motion to Dismiss by the Individual Defendants [Doc. 77] seeks dismissal of these Defendants for lack of personal jurisdiction and improper venue, such Motion is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 63] is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Signed: July 11, 2008

Martin Reidinger
United States District Judge